May it please this Honorable Court, I'm David Runke. I am joined at Council Table. Would you adjust that microphone please so we can hear you better? Tell me if that's better. And I'm joined at Council Table by my co-counsel, Paula Harms, and together we represent Keith Nelson, the appellant in this matter, who is under a sentence of death imposed in the in the year 2001. The jury that sentenced Keith Nelson to death was told by the prosecution that essentially this was simply a rotten human being who had committed a horrible crime. And what the jury never heard was the truth about who Keith Nelson was and his many experiences. The jury never heard undisputed evidence that he suffered from significant brain damage centered in the frontal lobe of his brain. The jury never heard that he was sexually abused repeatedly as a child, beginning with a stranger in California, including various boyfriends and other men in the house of his mother's, including time spent in juvenile institutions in the states of Missouri and Texas. The trial court made two findings of ineffective assistance of counsel at the penalty phase of this case. The first finding was that counsel was ineffective in the sense of deficient for failing to conduct an adequate mental health investigation. The second finding of deficiency, when I say ineffective, I'm talking about prong one of the Strickland test. The second finding of deficient performance was that counsel advised Mr. Nelson to refuse to cooperate in a mental health examination to be conducted by doctors selected by. So is our inquiry here only going to be as to prejudice? I'm sorry, I just did not know. Is our inquiry here only going to be the prejudice prong of Strickland? Yes, we have findings that I think are not basically challenged by the government that there was deficient performance here. And the reason the jury's never, never learned this information is because trial counsel ignored red flags, ignored a prior attorney's legal team's memorandum. We've crossed over then from. Let's cross over then. It's so prejudicial that it warrants. So we reach the 2255 hearings, four days of hearings, and the defense presents evidence from recognized and reputable experts that neuropsychological testing, significant neuropsychological standard testing shows that Mr. Nelson has significant frontal lobe brain damage. That testing is then buttressed by medical scanning procedures, an MRI, magnetic resonance imaging, and a PET scan, P-E-T scan stands for positron admission topography. Both of those medical tests confirm the findings of the doctors that there is significant frontal lobe brain damage. And there's more. The government hires its own expert as obviously they're entitled to do Dr. Daniel Martel. Significantly and somewhat ironically, Dr. Martel was one of the two doctors that Mr. Nelson refused to see five or six years earlier in advance of his trial. And Dr. Martel concludes that the defense experts are 100% right, that there is significant frontal lobe damage, which Mr. Nelson exhibits. The etiology of the damage is not 100% clear. There is a history of closed head injuries suffered by Mr. Nelson through childhood and into his adolescence and young adulthood. And Dr. Martel testifies that even without loss of consciousness, those can have significant neuropsychological impact and cognitive impact. And then there are the circumstances of Mr. Nelson's birth. He was a second born twin. The birth was difficult. He was hospitalized for more than a month following his birth. The medical records introduced at the 2255 hearings demonstrate that he suffered hypoxia, which is a lack of oxygen during the birth process, that he was blue. Well, how is it mitigating? How would it help tend to convince a jury that he should not be sentenced to death? Well, the idea that a defendant suffers from significant brain damage has been recognized by not only this court, but by the United States Supreme Court as significantly mitigating evidence. And I'm thinking... Why? What's the argument of the jury that he's not as responsible for his actions? Is that the argument? Or what would be... What would you argue in the... The suggestion would be that somebody who goes through life, whose brain is damaged, whose ability just to think things through is compromised. And that was the essence of this particular testimony. This particular crime was not a crime of impulse. It was a crime of planning. And the experts also testified, and this is the significance of the frontal lobe part of the damage, does not mean one cannot plan out certain things and have them be planned for quite a bit of time. But where the frontal lobe has the role to play, and all the experts agreed with this, the government's experts and the defense experts, is to review the plan in its executive capacity and say, no, this is a bad plan because very bad things will happen if this plan goes forward. And therefore, he's compromised in his ability to think things through, to take steps to say, I don't want to do this. I'm not going to do this. And this is not contradicted. I mean, this is not a matter... In Sears versus Upton, for example, in the U.S. Supreme Court, there was an argument between the defense experts and the government experts as to how significant was the relationship between the crime and the brain damage, as if there had to be a nexus, which the Supreme Court, again, has told us the fact of brain injury is in and of itself mitigating. The fact of mental disorder defect is in and of itself mitigating. And in Sears... And don't we still have to make the calculation as to whether it is so mitigating as to be conclusive that it was prejudicial to the trial? The approach and the test that the Supreme Court has posited is do we now have confidence in this verdict? And what a single juror had changed his or her vote had they been presented with this rich picture? This is the mental health piece of it, but also of the traumatic childhood that Mr. Nelson experienced. And we know in the federal system, this is a federal case that a single vote for life by a jury mandates a sentence of other than death. If it's 11 to 1 for death, the death penalty cannot be imposed. There is no new trial. And the sentencing function reverts to the judge. That's been the law since Jones versus United States was decided by the Supreme Court in 1999. So we know that if a single juror had been persuaded, the judge would have sentenced Mr. Nelson to a life term because that was the only alternative sentence available for this kidnapping resulting in death offense. And not only was the jury not exposed to this information or not given this information, defense counsel, because they had done such a poor job, explained that he was just fine based on his premature birth. So there's no, I respect, respectfully suggest that there is no dispute among the experts that Mr. Nelson suffered from the same kind of cognitive deficits and brain damage that has led this court among other other courts. I'm thinking about the language in Kenley against Armatrout, where this court said basically that mental disorders and disturbances are precisely the kinds of facts that juries can find mitigating. I'm reminded of Hill against Lockhart in this court where a history of schizophrenia was not presented to the jury and found to be error. In the Antwine case, all these cases are cited in our brief where even bipolar disorder was not presented. And if you look at the Supreme Court line of cases, starting with Brown against Quarterman in 2007, Porter against McCollum in 2009, Rumpia against Beard in 2005, Sears against Upton in 2010, all of these cases were penalty phase reversals based on ineffective assistance of counsel for failure to present readily available mental health mitigation. In Sears against Upton, as we pointed out in our brief, the court, Supreme Court, refers to neuropsychological testing that had been administered to the defendant as terribly significant in terms of his frontal lobe damage and coincidentally point out to two particular testing, one called the Stroop, S-T-R-O-O-P, and the other called Trails Making B, where the defendant in that case scored in the lower 1% to 2% of the population, which is precisely where Mr. Nelson scored on those same tests and even lower in other tests of cognitive functioning and brain functioning. The Supreme Court felt that the failure to present that readily available evidence was ineffective assistance of counsel that was prejudicial and that undermined confidence in the outcome of the verdict. I mean, in Porter versus McCollum, the court faults the trial judge for not taking into consideration the impact that the defense experts might have had on a jury. Consider that one step further. Consider the impact in a jury where an expert called by the prosecution or an expert who had been retained by the prosecution, probably now called by the defense and an expert retained by the defense, testified that they are in total agreement that Mr. Nelson in fact suffers from severe and significant brain damage. It allows defense counsel to say to a jury, we don't know where this came from. It's probably related to the circumstances of his death, but it is certainly not his fault. It's not something of his choosing, but his brain is damaged. He does not have the ability to think that a person without a brain damage brain has. You are being told by the government that the only choice here is death. We are asking you to take through the next step, which is to lock him up in a maximum security federal prison for the rest of his life. And that is the alternative to the death sentence. And that is sufficient. Well, if we were to agree with you that there's prejudice here, wouldn't the remand for that evidence to be presented? If you would agree that there was prejudice, then the remedy would be to vacate the sentence of death and remand for a new penalty phase because Mr. Nelson had entered a guilty plea to the underlying capital charge so that on the issue of brain damage, that would not be the remedy would be to remand for a new penalty phase if the government chose to pursue a new penalty. One thing that concerned me about this case is the district court's finding that the trial lawyer was strategically deficient. Yes, sir. In an effort to set up someone like you, 17 years later, to get the sentence vacated and then stand here and say if the government even chooses to proceed with the resentencing. Yeah. And in the opinion, as I understand it, Judge Geithan cited the same lawyer's case where the district court did vacate the sentence and the government did not choose to pursue a resentencing. And so it was effective in that sense. What are we supposed to do with that? I think you're supposed to find that a clearly erroneous finding. Suppose it's not clearly erroneous. Where does that leave us? It is. Let me just unpack it a little bit for that tactic to really be true. What a lawyer has to say, understand that Mr. Berrigan has done no mental health testing of Keith Nelson. He doesn't know whether he's going to show up with mental health problems or not. But the idea being, well, here's what I'm going to do. I'm not going to do mental health testing. And I'm going to hope that if he gets a sentence of death, somebody will do mental health testing down the road. And that will determine that he has significant mental health problems. And maybe some court will rule that I was ineffective. So he gets to do it all over again. And well, there was no finding in that Johnson case. You're talking about the Angela Johnson case out of Idaho, Iowa. There was no finding in the Angela Johnson case that this was a tactic. No, there was a finding that it was a failure. It was ineffective. And the outcome was that she ended up with a life sentence. Well, that's how it worked out. I read the Reddit. It's huge. It's long as saying Mr. Nelson, Ms. Johnson was failed in her case, just as Mr. Nelson was failed in his case. And the fact that the government did not choose to re-seek death is just as a decision that the government reached for all of the reasons that the government has when it makes that decision. My concern is the judge said the attorney in this did it strategically so that if the sentence were death, he would have this opportunity later. And for all the reasons the government decides, it might not proceed or you might have a better chance of a life sentence 17 years later, or the Supreme Court might do something that narrows the far-fetched suggestion. I think it's as far-fetched a suggestion as I can imagine that a lawyer would deliberately throw a death penalty case on the whim in a prayer that someday something different might happen rather than doing what a lawyer is supposed to do, which is go ahead and investigate. You shouldn't do that, but you can see the strategic thinking that might go into that if he thinks it's a long shot defense either way. I don't think it's ever, and I think what Judge Geithner found was it's never a reasonable strategy to deliberately take a dive in a capital case. And the cases we've cited in our brief support that proposition. This is not reasonable strategy. This is to me the essence of ineffective assistance of counseling. This is true. I would posit it's probably not an ethical strategy, but it may be effective in the sense of it actually working. I've never heard of somebody doing this, and I've been trying capital cases in 1983, and it just, I can't tell you how offensive the idea is. This is an experienced criminal defense. That's why I raise it, because there was a finding that it's what happened here, and that raises a question of what if it's offensive, what should we do about it? I don't think there's any evidence in this record that supports that. The idea that he quote-unquote did it in Angela Johnson successfully is just a reach. Besides, this case was tried before Angela Johnson's case was tried. In fact, in the record, one of the things Mr. Berrigan is doing that's taking up so much of his time instead of working on this case is that he's traveling out to the Angela Johnson venue. I don't know if the judge found that he did it intentionally in the Iowa case. No, there was no such thing. He did it intentionally in this case. And that was based on the government's argument that somehow this must have been intentional. Mr. Berrigan testified under oath that that was completely wrong, that he never did anything to set up an appellate argument, that he had to win these cases at trial. Arguably, that makes it worse. We have a credibility finding from the district court that he didn't believe Berrigan. I don't think it's supported by any evidence. I don't think it's supported by the Angela Johnson decision at all or anything beyond that the government made an argument that the judge latched on to. So my light is red, which means I'm running into my four minutes of... I think you've already used it. Can I ask him one question about Porter versus McCollum? You'll agree that this is not a Porter versus McCollum case. What about Porter? This is not that case. Did Mr. Nelson fight bravely in any battle anywhere? Did he do anything ever in his life to commend himself to anybody? This is not Porter against McCollum. You keep citing it. Well, because what the Supreme Court found was that there was readily available mitigating evidence of brain damage that was not presented, and that was ineffective assistance of counsel and prejudicial, which is... The rest of it is just fluff. The rest of it is more evidence, but... It's Justice Stevens' tribute to wartime service, isn't it? I'm familiar with the case, and I know it's the Korean War event. Better than I do. Sure, but... And Porter versus McCollum requires us to reweigh the totality of the mitigation evidence against the evidence and aggravation. But there was no doubt that... Is that what Judge Gaetan did? But the finding of ineffective assistance was based in part on the failure to present readily available evidence of brain damage, brain dysfunction, cognitive... What do we use when we determine whether or not this rises to the level that it undermines our confidence in the outcome at the penalty phase? There's no standard that comes down that you can... I just have to decide these things. If we decide against you, you know what's going to happen. Your next hope is in the Supreme Court. Well, I'd rather not be on my way to the Supreme Court on this issue. I think that the line of Supreme Court cases that talk about the importance of mental disorder and defect as mitigating evidence, and that talk about the failure to investigate and present such evidence as being ineffective assistance of counsel, and in several circumstances cited in our brief prejudicial ineffective assistance of counsel. And I thank your honors for listening. I am out of the time. Thank you. May it please the court. Your honors, my name is Jeffrey Vellini on behalf of the United States, and I want to start kind of where you went, Judge Colleton, about the stratagem. And though Judge Gaitan found that, it was at some urging of the government based upon knowing what had happened in this case and knowing Mr. Berrigan. What's the evidence in the record that this was... The record in the evidence is that Mr. Berrigan is a seasoned practitioner in the capital habeas area. He knows what he's doing. He did it for years for the Missouri State Public Defender System. He went out in private practice. He was sought out as learned counsel throughout the region, Missouri, Kansas, Iowa, whenever a federal death penalty case came along. Subsequent to the hearing in this case, he's been rehired by the Missouri Public Defender System in charge of their death penalty litigation. When you look at that case, or this case rather, in conjunction with Johnson, it's important to know that there's another lawyer that the Judge Gaitan was aware of, who was a protege of Pat Berrigan, Jennifer Brewer in the record, sometimes Jennifer Herndon. She got married during the course of all this litigation. In three cases, when she learned at Pat Berrigan's feet in the State Public Defender System, this case, the United States versus Hermann Sinisterra in the Western District of Missouri, and the case of Norris Holder and Billy Jerome Allen here in Eastern District of Missouri, when a death sentence defendant went for post-conviction relief for the first time, she confessed error on either herself or a co-counsel, as Mr. Berrigan does here. When you look at it, not in the vacuum of one case, but in the totality of the cases that they're representing people for in the Western District of Missouri or in federal courts in general, it's clear that Mr. Berrigan knows what to do. He knew that mental health evidence would hurt him. He testified as such. He said that in his experience, that if the government was able to take a mental health examination and put his client in the crucible of that investigation and do the investigation as is appropriate through interviews, that the evidence would be the last thing the jury heard, and it was absolutely devastating to him. Mr. Berrigan said that he then engaged in a campaign, a military campaign, a strategic withdrawal or retreat, so to speak, fighting if, when, how, where, or if at all a mental health examination would be done of his client. That information is all very important to understand why Judge Gaitan, talking too quickly, excuse me, why he chose to believe and ultimately rule that Mr. Berrigan engaged in a strategically deficient strategy. Nonetheless, does that lead us, though, I mean, in Strickland terms, the judge said even though it was strategic, it still counts as objectively unreasonable performance, and I suppose he thinks the strategic activity just has to be handled by an ethics board or something. It doesn't really factor into the analysis as far as I could tell. I think ultimately that's correct, Your Honor. I think ultimately the conclusion by Judge Gaitan was that there was deficient performance as it and the question then became, as was the first question by the panel, do we look at prejudice? Do you agree with that, that if there is strategic deficient performance that we can't say that it was an effective assistance of counsel because it quote-unquote worked, or do you think it should somehow factor in? I believe that it's my position. I have to, I'm defending Judge Gaitan's order. He found it. We employed. Ultimately, Judge Gaitan did not agree with that position, though he called it strategically deficient. He did say it was deficient. The United States position was that as a stratagem, it was not deficient. He chose to go down a certain path because he felt that that evidence would hurt him. He chose to not use evidence that he felt would not help him at the trial, but would then help him later. So you're saying it was effective not because it was an Is that what you're saying? Yes, sir, it is. But you're not really on appeal pushing that as a reason for affirmance. I don't think we can based upon Judge Gaitan's order. It's certainly within the body of the record in this case, and it's the position that we've taken consistently throughout, but I think that you can look at it importantly through the prejudice analysis in Strickland, as Judge Gaitan did in his order. He did what he's asked to do under the Supreme Court jurisprudence in this case. He reweighed the evidence. He went through in detail in his order the evidence and mitigation that was presented at trial. He went through in detail the evidence and mitigation that was found by post-conviction counsel and put into the hearing in the 2255, and then he reweighed that against the evidence and aggravation and concluded that the new evidence and mitigation was not sufficient, in his opinion, to undermine the confidence of the jury's opinion. And I think it's very important when you look at that to understand that he did do what he's asked to do. He reweighed the evidence. He didn't dismiss it out of hand, despite finding that Pat Berrigan engaged in this stratagem. He reweighed it and concluded properly, I'd argue, that the new mitigating evidence did not rise to the level of undermining the verdict. It's undoubtedly true that government expert, in this case, Dr. Dan Martell, a neuropsychologist, found brain damage. But just because there's frontal lobe brain damage does not mean that there is correspondingly excused behavior. Dr. Gurr tried to come up with these very pretty pictures, as he admitted in cross-examination, to show the scale of the insult to the frontal lobe. He had to ultimately admit that the scaled system that he used was a unitless scale and therefore meant nothing, implication-wise. Dr. Martell, on the other hand, tells you about the frontal lobe. The frontal lobe essentially governs executive function in human beings, and often that's referred to as impulsivity. As Judge Smith has said, this wasn't a crime of impulse. This was a crime of planning. This was a crime where he'd tried it before. And when he was unable to subdue her after putting a handcuff on her wrist, when she went limp and he was no longer able to drag her, Keith Nelson looked at her and said, don't look at me, leap, or I'll kill you. Instead, having had that failure, over the next week, he told his co-workers about, I need to pick a younger, easier, controllable victim. He joked with co-workers that he was going to do their horror, didn't believe him until it actually happened. And when he went to do the crime in October of 1999, he took with him ligature, or cords, to bind her. He made an effort to pick her up in broad daylight by ducking down in the truck and getting her into the car and speeding away. He took her across state lines to a secluded area in the woods where he could do the unspeakable things he did to her. Once he did that, he covered her body up with leaves in the area in which he lived. After coming back from committing the crime, he took steps to cover up his acts. Again, acts showing not impulsivity control, but showing undamaged executive function. To suggest that because he can't review the plan is an improper allegation, your honors, because all criminals commit some plan. Are we to suggest that everyone that comes before these courts has brain damage to mitigate whether they should be sentenced? I think the answer is no. In this case, he wiped the truck down. He took the truck away at night and abandoned it. He went back later on and tried to get away from the police and hide, and ultimately, because he injured himself in that effort, he was apprehended. Nothing about what he did on October 12, 1999, as it relates to Pamela Butler, and within the record, tells you that he has impulsivity issues or an insult to the executive function in the way his brain operates. He might have a criminal mind, but he doesn't have a broken one, and I think that's very important because that's the evidence that Judge Guyton had before him when he heard from Dr. Martell, who under oath said, yes, there is brain damage here, but this brain damage does not, in my estimation, indicate in any way that Mr. Nelson suffered from impulsivity concerns. All of those are very important when you analyze the prejudice analysis that Judge Guyton underwent. I think it's painstaking detail in his, I think, 53-page order, and it was done correctly. We would urge you to uphold the ruling that Judge Guyton did and say that Mr. Nelson did not suffer prejudice. There's no indication that the jury would have returned a different verdict. They were exposed to 17 witnesses, maybe 16 in one video or audio tape, over two days to talk about what the life that Mr. Nelson was and how he lived his life. They heard of the squalid conditions he lived in. They heard about his mother and the horrible upbringing he and his brothers had. The jury heard about all of those incidents. They didn't hear about sexual abuse. I don't believe they did, Your Honor. They heard some, did they hear all that would have been available had Mr. Berrigan asked for a continuance and done a better job? Your Honor, I think they heard a substantial amount of evidence. Could they have heard more? There's no doubt, and I would argue in this case or any other case, when you're given years more time, you're inevitably, if you're working the case, going to find more information, and I would suggest to you that's what's happened here. Post-conviction counsel has had years to build upon the work that was done in 1999 to 2001 when this case was tried, and they've uncovered additional information, but not powerful new evidence of actual innocence, as we talk about in 2255s. I think that the presentation... In other words, a mere six months continuance or even a year would not have made any difference? Your Honor, I can't say that I can answer that because I don't know what stage they were at and what they were doing. I can tell you that I think they've done a pretty comprehensive job on the 17 witnesses and the evidence that was presented back in 2001 when this case was tried before Judge Gaetan, and it's my argument that what they did was an efficient one. Do you find it of concern, this is I'm reading from the brief, despite not being ready for trial, Mr. Berrigan felt bound by the fact that he had accepted an appointment in the case with the tacit understanding that he would be granted only one continuance? And when he testified at the 2255 hearing, he said that he knew he could have asked for more time and chose not to. Ms. Hunt knew the same thing and chose never to ask for a continuance. Ms. Brewer knew that she could ask for a continuance and chose not to. When she did the case, she was originally testified that I couldn't have asked for another continuance because I was under an order from the clerk's office of the Eighth Circuit that no further continuances would be granted. Well, when she was asked, you were under that order, didn't you ask for and obtain a second continuance after that? Or another continuance, I guess is the better way to say it. And she said, of course, I did get another continuance. Mr. Berrigan, no one told, no judge told him he could or couldn't get another continuance. He chose not to and said that he thought he was ready. In retrospect now, he says that maybe he wasn't ready. And I would suggest to you that's part of the stratagem. As he said in his own testimony, if a client's sentence of death is reversed in post-conviction analysis, it gives that client a second bite at the apple. You see him use the language, I dropped the ball. That language was used in this case. That language was used in Angela Johnson's case in Iowa. Ms. Brewer used the same language. All of that, when you take it out of the vacuum of a single case and listen to it in the totality of the circumstances, tells you that this is gamesmanship, the government has always alleged, in an effort to give their client another bite. Are there any cases giving us guidance on the concept of strategic deficiency? Your Honor, I'm not aware of any. I'm aware, of course, that strategic decisions generally are given great deference in 2255 proceedings. I've never heard of a strategic deficiency. Just because of the totality of the circumstances, it was important that we argue that because we thought that influenced the decision making in this case and we thought it was important that Judge Guyton be aware of it and ultimately he agreed with that conclusion. I'm not aware of any case law, however, that would allow, give guidance on how we handle that. Well, the Supreme Court says in this situation we necessarily have to speculate as to the effect of the new evidence. Correct. We have to re-weigh the aggravating evidence against the mitigating evidence that was, I guess, introduced at the first trial, plus the new evidence that would have come in but for the deficient performance. I believe that's correct, Your Honor. I think that... Do you have anything else to say about how we should speculate about that? I don't know how to, other than to do what Judge Guyton did in this case. I think the Supreme Court reiterated that as recently as last week. No amount of evidence could have overcome the aggravation. That's arguably problematic. I think that the one word, no amount of evidence, the one phraseology certainly could be problematic but I think read his order, the 53 pages in context... Well, we don't have to necessarily adopt his reasoning, that's why I'm asking you... I don't believe that's true. Weighing it. I do believe you have to re-weigh it, as he did. I believe you have to re-weigh the case in aggravation, the case in mitigation, with the addition of the new material, which he did in his order, and I would submit to you that Judge Guyton did so correctly when he re-weighed and that new evidence, when you look at it in its light, as it relates to the evidence previously put before the jury, when it's weighed against the aggravating evidence unanimously found by the jury, that the conclusion that jury reached was the proper one. Or we do guard against, if that's something that we appellate judges have to guard against, or trial judges, what do they say down in the Fifth Circuit? Brutality trumps everything else? I think that there was a case there that I.E. Estes was referring to in the brutality and trumps, and I don't think that's proper. I don't think the right way is what Judge Sotomayor would have said in the concurring opinion. It's dramatic. It's a dramatic characterization. But, I say but, to follow up on what Judge Guyton says, how do we speculate? Speculate in the terms of applying life's experiences, judges, to the facts of the case and the law involved? I think that's correct, Your Honor. How do we respond to the examples listed in the appellant's brief about what appear to be equally horrendous crimes in which death penalties have not been imposed? I haven't read the records in those cases, and presumably you haven't either. Yes, I can't say that I have read the records and all them, but I will tell you that when you're talking about I.E. Estes, when they're talking about an inferior mitigation investigation, Judge Sotomayor, or Justice Sotomayor correctly pointed out, they put in two minutes of mitigation testimony. We're talking about two days here and 17 witnesses, so there was a substantial presentation in this case. I would have to go through each of those cases and say, was there a substantial presentation or was there a lack of a presentation? And then the post-conviction counsel found a substantial amount of evidence. I believe in this record, based upon the presentation that was done by Mr. Berrigan in the case of mitigation over two days, in context with the new evidence, when it's reweighed against that case in aggravation, the conclusion that Judge Gaetan reached is the proper one. That is that no reasonable juror would disagree with the confidence of the opinion the original jury returned in this case. There are no further questions. I think I will sit down. Thank you. Mr. Valente. Counsel, I think you used all your time, but we'll give you a minute if you heard something you... Okay, thank you very much. So, if the government seriously pushes this position that Mr. Berrigan made a deliberate decision to throw this case so that his client would be sentenced to death, he was deprived of the assistance of counsel, period. Counsel does not sign on to a case to have his client receive the worst possible result. Supreme Court, in Kimmel v. Morrison, cited at page 11 of our opening brief, said no reasonable lawyer would forego competent litigation of meritorious, possibly decisive claims on the remote chance that his deliberate dereliction might ultimately result in collateral attack. The court describes it as inconceivable, but if the government wants to push that position, there they are with that position. On the issue that was raised about a continuance, the defense was not ready in this case. Mr. Valente, the defense missed powerful mitigation evidence. They missed the brain damage and they missed the more horrendous aspects of his childhood, including the sexual abuse. Judge Guyton never made a finding that this did not happen or that the sources were not credible. He made no finding that the defense experts were not credible. Repeating things you told us already. So I think there is overwhelming doubt about the reliability of the verdict. Thank you very much for your indulgence. Thank you. I believe that concludes our